Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| DR. KENNETH O. CINTRÓN VELÁZQUEZ<br><br>Recurrido<br><br>v.<br><br>MEDICINA SISTÉMICA LLC; CENTRO MÉDICO DOCENTE ADAPTÓGENO; CENTRO MEDICINA REGENERATIVA; JOSÉ A. OLALDE RANGEL; ASEGURADA XYZ<br><br>Peticionarios | TA2025CE00329 | *Certiorari* procedente del Tribunal de Primera Instancia Sala de Bayamón<br><br>Caso Núm. BY2022CV00775<br><br>Sobre: Daños por violación a la Ley 139 del 2011; Injuction Preliminar y Permanente; Incumplimiento de Contrato |

Panel integrado por su presidente, el Juez Rodríguez Casillas, el Juez Adames Soto, la Jueza Mateu Meléndez y el Juez Marrero Guerrero

Rodríguez Casillas, juez ponente.

## SENTENCIA

En San Juan, Puerto Rico, a 3 de marzo de 2026.

Comparece ante nos, Medicina Sistémica, LLC h/n/c Centro Médico Adaptógeno y/o Centro de Medicina Regenerativa (en adelante, "Medicina Sistémica" o "Peticionaria") y nos solicita que revoquemos la *Resolución* emitida el **2 de julio de 2025**,[1] por el Tribunal de Primera Instancia, Sala Superior de Bayamón (en adelante, "TPI" o "tribunal de instancia").[2] Mediante esta, se declaró *No Ha Lugar* una moción de sentencia sumaria presentada por **Medicina Sistémica**.[3]

Por los fundamentos que expondremos a continuación, expedimos el recurso de *certiorari* y modificamos la *Resolución* recurrida.

---

[1] Notificada el 7 de julio de 2025.
[2] Entrada Núm. 288 del Sistema Unificado de Manejo y Administración de Casos (en adelante, "SUMAC").
[3] Entrada Núm. 282 de SUMAC.

**-I-**

El caso ante nos se originó el **23 de febrero de 2022**, ocasión en que el Dr. Kenneth O. Cintrón Velázquez (en adelante, "doctor Cintrón Velázquez" o "Recurrido") instó una *Demanda* sobre daños por violación a la Ley 139 del 2011; injunction preliminar y permanente e; incumplimiento de contrato en contra: **Medicina Sistémica**, Centro Médico Docente Adaptógeno, Centro Medicina Regenerativa, José A. Olalde Rangel y Aseguradora XYZ.[4] En esencia, el **doctor Cintrón Velázquez** alegó que, en febrero de 2019, suscribió un contrato con la **Peticionaria** para prestar sus servicios profesionales en el Centro de Médico Adaptógeno. Según adujo, el acuerdo incluía la utilización de su imagen como figura protagonista del mercado de **Medicina Sistémica**. Esbozó que, para ello recibiría una remuneración de $3,000.00 mensuales por un término de tres (3) meses. No obstante, agregó que, del contrato se desprendía que cualquiera de las partes podía rescindir del mismo con una notificación escrita a la otra parte con al menos treinta (30) días de anticipación, y que la **Peticionaria** descontinuaría todo uso de material con la imagen propia del **Recurrido** de manera inmediata.

Así pues, el **doctor Cintrón Velázquez** adujo que el 16 de enero de 2020, presentó a **Medicina Sistémica** una carta de terminación de servicios, efectiva el 15 de febrero de 2020. Sin embargo, esta le indicó que su último día de servicios sería el 30 de enero de 2020. No obstante, señaló que, la **Peticionaria** le solicitó permiso para utilizar su imagen hasta el 31 de marzo de 2020, a lo cual el **Recurrido** se negó.

No empece lo anterior, el **doctor Cintrón Velázquez** alegó que la publicidad no fue removida como se le había garantizado, por lo que ello,

---

[4] Entrada Núm. 1 de SUMAC. Posteriormente la demanda fue enmendada para aumentar el alcance de esta y las partidas monetarias solicitadas por los daños ocasionados; refiérase a las Entradas Núm. 123 y 135 de SUMAC.

constituía un incumplimiento con lo pactado. Reclamó se le ordenara a **Medicina Sistémica** la remoción inmediata de todo video e imágenes suyas de las redes sociales y que cesaran de utilizar su nombre sin su autorización. Además, solicitó una indemnización de $1,500,000.00 por daños y perjuicios, uso indebido de su imagen, derecho a la intimidad y publicidad, enriquecimiento injusto y angustias mentales.

Tras varios trámites procesales, el **17 de abril de 2022**, **Medicina Sistémica** presentó su *Contestación a demanda, reconvención y demanda contra tercero*.[5] En síntesis, alegó que, luego del 30 de febrero de 2020, no colocó publicidad, ni promoción paga con la imagen del **Recurrido** en redes sociales, y que desde diciembre de 2021 no se trasmitió el infomercial con la imagen única del **doctor Cintrón Velázquez**. Añadió haber removido de las redes sociales las imágenes que estaban bajo su alcance, por lo que solicitó se desestimara la demanda.

En lo que respecta a la *reconvención*, **Medicina Sistémica** reclamó daños por incumplimiento contractual ascendentes a $500,000.00, así como una compensación de $150,000.00 por la inversión perdida.[6] Solicitó, además, se le hiciera un referido ético al **doctor Cintrón Velázquez**.

En cuanto a la *demanda contra terceros*, incluyó al **doctor Cintrón Velázquez** —en su carácter personal—; a su esposa, denominada Fulana De Tal y;[7] la Sociedad Legal de Gananciales compuesta por ambos. Solicitó una compensación de $500,000.00 por los daños ocasionados y otra de $150,000.00 por el engaño.

---

[5] Entrada Núm. 23 de SUMAC. La *Contestación a demanda, reconvención y demanda contra tercero* fue enmendada en varias ocasiones; Refiérase a las Entradas Núm. 42, 105, 113 y 141 de SUMAC.
[6] *Íd.*
[7] Posteriormente sustituido por Marinelli Colón Quiñones.

El **19 de mayo de 2022**, el **doctor Cintrón Velázquez** radicó su *Contestación a reconvención*.[8] En esencia, negó las alegaciones de la reconvención y solicitó la desestimación de esta.

Luego de varias incidencias procesales, el **5 de junio de 2025**, **Medicina Sistémica** radicó una *Moción en solicitud de sentencia sumaria*.[9] Señaló que, en esencia la controversia a resolverse por el tribunal de instancia se reduce a lo siguiente:

> A base lo discutido en esta moción, la controversia que este Honorable Tribunal viene llamado a resolver es si se sostiene un reclamo por violación a los derechos de "propia imagen", en el contexto de un reclamante que suscribió un contrato para autorizar el uso de su imagen y luego, ante la terminación de su relación profesional con la entidad usuaria de las imágenes, solicitó el cese del uso concernido, aspecto al cual el usuario accedió.
> [...]
> En este escrito Medicina Sistémica solicita que se dicte sentencia sumaria en relación con la totalidad del único reclamo pendiente de adjudicación en autos, que **se ciñe a una solicitud de compensación monetaria en virtud de las protecciones que derivan de la Ley del Derecho sobre la Propia Imagen, Ley 139-2011**. Con sujeción a lo intimado en los acápites VII y VIII de esta Moción, Medicina Sistémica solicita que se dicte sentencia final de desestimación en cuanto a la totalidad de esta acción pendiente.[10]

A esos fines, arguyó que los siguientes **hechos no estaban en controversia**:

> 1. El 15 de marzo de 2019 Medicina Sistémica LLC (en adelante denominada como "MS") y el Dr. Kenneth O. Cintrón Velázquez (en adelante denominado como el "Dr. Cintrón"), suscribieron un contrato intitulado Relevo y autorización: Sobre derechos de propia imagen. (**ANEJO-1**, *Relevo y autorización: Sobre derechos de propia imagen*, **Págs. 1 y 4**).
>
> 2. En la cláusula TERCERA del Relevo y autorización: Sobre derechos de propia imagen, se estableció que, a beneficio del Dr. Cintrón, existiría una compensación única de $3,000.00 mensuales por los primeros 3 meses, a partir del momento en que su imagen comenzara a ser utilizada en los medios. (**ANEJO-1**, *Relevo y autorización: Sobre derechos de propia imagen*, **Pág. 2**).
>
> 3. En la cláusula CUARTA del Relevo y autorización: Sobre derechos de propia imagen las partes pactaron que el Dr. Cintrón

---

[8] Entrada Núm. 32 de SUMAC. La *Contestación a reconvención* fue enmendada en varias instancias; Refiérase a las Entradas Núm. 35, 54 y 148 de SUMAC.
[9] Entrada Núm. 282 de SUMAC. Anejó los siguientes documentos: **ANEJO-1**, *Relevo y autorización: Sobre derechos de propia imagen*; **ANEJO-2**, *Transcripción de la toma de deposición del Dr. Cintrón*; **ANEJO-3**, *Transcripción de la toma de deposición del Sr. Olalde*; **ANEJO-4**, *Transcripción de la toma de deposición de la Sra. Colón Quiñones*; y, **ANEJO-5**, *Transcripción de la toma de deposición del Sr. Pedreira Abreu.*
[10] Entrada Núm. 282 de SUMAC, página 4 de 1

concedía a MS autorización total y plena para que MS obtuviera material con imagen propia del Dr. Cintrón y le utilizara para el logro de los objetivos de mercadeo, publicidad y promoción de los servicios de Medicina Sistémica LLC. (**ANEJO-1**, *Relevo y autorización: Sobre derechos de propia imagen*, **Pág. 3**).

4. En la cláusula SÉPTIMA del Relevo y autorización: Sobre derechos de propia imagen, el Dr. Cintrón reconoció que la campaña mediática no sólo beneficiará a MS, sino que sería también de beneficio para su propia imagen, al otorgarle notoriedad y prestigio en el ámbito profesional. (**ANEJO-1**, *Relevo y autorización: Sobre derechos de propia imagen*, **Pág. 3**).

5. En la cláusula NOVENA del Relevo y autorización: Sobre derechos de propia imagen, las partes pactaron que ante la terminación del contrato de servicios profesionales existente entre MS y el Dr. Cintrón, MS descontinuaría de forma inmediata la utilización de material con imagen propia del Doctor. (**ANEJO-1**, *Relevo y autorización: Sobre derechos de propia imagen*, **Pág. 3**).

6. De ninguno de los contenidos del Relevo y autorización: Sobre derechos de propia imagen, ni de la cláusula NOVENA que con especificidad acoge las obligaciones asumidas entre las partes ante la terminación de su relación – *con respeto al uso las imágenes del Dr. Cintrón* – surge obligación alguna de MS de **retirar** de las redes sociales, las imágenes que se colgaron durante la vigencia del Relevo y autorización: Sobre derechos de propia imagen. (**ANEJO-1**, *Relevo y autorización: Sobre derechos de propia imagen*, **Págs. 1-4**).

7. Todas las imágenes que se colgaron en redes sociales, YouTube o Facebook, del Dr. Cintrón, fueron imágenes que el Dr. Cintrón autorizó en virtud del Relevo y autorización: Sobre derechos de propia imagen. (**ANEJO-2**, *Transcripción de la toma de deposición del Dr. Cintrón*, **Pág. 74; L. 20-24**).

8. Al fin de la relación contractual entre las partes, al Dr. Cintrón se le solicitó que permitiera el uso de las imágenes hasta el 15 de marzo del 2020[,] pero este se negó, solo permitió que las imágenes fueran utilizadas hasta el 15 de febrero de 2020. Sin embargo, el Sr. Olalde eliminó todo al 31 de enero de 2020, es decir, 15 días antes. (**ANEJO-3**, *Transcripción de la toma de deposición del Sr. Olalde*, **Pág. 32; L. 22-25 / Pág. 33; L. 1 3 / Pág. 40; L. 2-13**).

9. La imagen del Dr. Cintrón dejó de aparecer en material promocional de MS, a partir del 30 de enero del 2020. (**ANEJO-3**, *Transcripción de la toma de deposición del Sr. Olalde Rangel*, **Pág. 26; L. 1-5 / Pág. 40; L. 2-13**).

10. Sin embargo, MS admite un error cometido en febrero del año 2022 que tuvo por efecto la errónea utilización de la imagen del Dr. Cintrón, en un período de treinta (30) días. Esos treinta (30) días fueron del 25 de enero del año 2022, hasta el 22 de febrero del año 2022 (**ANEJO-3**, *Transcripción de la toma de deposición del Sr. Olalde Rangel*, **Pág. 42; L. 2 8; L. 14-15**).

11. La Sra. Marinelli Colón Quiñones es esposa del Dr. Cintrón. (en adelante denominada como "Sra. Colón") (**ANEJO-4**, *Transcripción de la toma de deposición de la Sra. Colón Quiñones*, **Pág. 9; L. 2-8; L. 9-16**).

12. Después de finales de 2021, la Sra. Colón accedía al portal de Facebook varias veces al día, a la semana y al mes. (**ANEJO-4**,

*Transcripción de la toma de deposición de la Sra. Colón Quiñones*, **Pág. 74; L. 3-9**).

13. El propósito para el cual la Sra. Colón accedía al portal de Facebook con esta regularidad era para ver la cuenta y derivar si imágenes del Dr. Cintrón permanecían en ella. (**ANEJO 4**, *Transcripción de la toma de deposición de la Sra. Colón Quiñones*, **Pág. 74; L. 10-16**).

14. Cuando la Sra. Colón accedía al portal de Facebook, notaba que las imágenes eran las mismas a las que había accedido, probablemente, por la mañana, el día anterior, el mes anterior, y hasta seis meses antes. (**ANEJO-4**, *Transcripción de la toma de deposición de la Sra. Colón Quiñones*, **Pág. 74; L. 17-25 / Pág. 75; L. 1-3**).

15. En algunas instancias de búsqueda que realizaba la Sra. Colón, en el portal de Facebook, algunas imágenes no aparecían y otras sí aparecían. (**ANEJO-4**, *Transcripción de la toma de deposición de la Sra. Colón Quiñones*, **Pág. 75; L. 4-12**).

16. De la búsqueda realizada por la Sra. Colón, esta derivó que, a lo largo del tiempo, fueron desapareciendo imágenes, porque hubo un movimiento de eliminación de videos. (**ANEJO-4**, *Transcripción de la toma de deposición de la Sra. Colón Quiñones*, **Pág. 75; L. 13-18**).

17. Para acceder a algunas de las imágenes del Dr. Cintrón, la Sra. Colón tuvo que "desplazar" la pantalla (o hacer "scrolling"), para alimentar y refrescar esa página e ir encontrando las imágenes mientras navegaba la página (**ANEJO-4**, *Transcripción de la toma de deposición de la Sra. Colón Quiñones*, **Pág. 75; L. 19-25**).

18. La Sra. Colón se mantuvo accediendo a Facebook desde finales de diciembre de 2021, y si percibía imágenes de su esposo, el Dr. Cintrón, le tomaba capturas de pantalla ("screenshots") y así lo hizo por un año. (**ANEJO-4**, *Transcripción de la toma de deposición de la Sra. Colón Quiñones*, **Pág. 81; L. 11-25 / Pág. 83; L. 17-22**).

19. La Sra. Colón solo accedió al portal de Facebook para indagar sobre la utilización de imágenes del Dr. Cintrón y no accedió a ninguna otra red social. (**ANEJO-4**, *Transcripción de la toma de deposición de la Sra. Colón Quiñones*, **Pág. 77; L. 2-8**).

20. **El Dr. Cintrón y su esposa, la Sra. Colón, se entretenían buscando esos videos en Facebook**. (**ANEJO-2**, *Transcripción de la toma de deposición del Dr. Cintrón*, **Pág. 101; L. 16-21**).

21. La Sra. Colón no recuerda cuántas capturas de pantalla tomó en total, durante ese período de más de un año, en que hizo visitas al portal de Facebook. (**ANEJO-4**, *Transcripción de la toma de deposición de la Sra. Colón Quiñones*, **Pág. 83; L. 17-22**).

22. La Sra. Colón fue quien decidió qué imágenes el perito de la parte demandante (Sr. Pedreira Abreu) tomaría de su teléfono, para la realización de su análisis pericial. (**ANEJO-4**, *Transcripción de la toma de deposición de la Sra. Colón Quiñones*, **Pág. 61; L. 7-20**).

23. El Dr. Cintrón, desde su aparato móvil, llegó a tomar capturas de pantalla, pero no recuerda cuántas tomó. (**ANEJO-2**,

*Transcripción de la toma de deposición del Dr. Cintrón*, **Pág. 91; L. 20-25**).

24. El Perito de la parte demandante (Sr. Pedreira Abreu), cuyos servicios fueron contratados para autenticar las imágenes en controversia, nunca (con excepción del caso de marras) había sido requerido para emitir una opinión sobre la autenticidad de información electrónicamente almacenada. (**ANEJO-5**, *Transcripción de la toma de deposición del Sr. Pedreira Abreu*, **Pág. 23; L. 23-25 / Pág. 24; L. 1-6 / Pág. 27; L. 13-17**).

25. El Perito de la parte demandante (Sr. Pedreira Abreu), cuyos servicios fueron contratados para autenticar las imágenes en controversia, no tiene experiencia previa en la indagación forense de datos almacenados en un aparato móvil. (**ANEJO-5**, *Transcripción de la toma de deposición del Sr. Pedreira Abreu*, **Pág. 24; L. 1-6**).

26. El Perito de la parte demandante (Sr. Pedreira Abreu), cuyos servicios fueron contratados para autenticar las imágenes en controversia, no examinó literatura relacionada con la autenticación de imágenes electrónicamente almacenadas, a los fines de cumplir con su encomienda en este asunto. (**ANEJO-5**, *Transcripción de la toma de deposición del Sr. Pedreira Abreu*, **Pág. 69; L. 2-4**).

27. El Perito de la parte demandante (Sr. Pedreira Abreu), no puede "atestar bajo juramento" sobre un asunto de cadena de custodia, porque sería totalmente irresponsable de su parte asegurar bajo juramento que hay una cadena de custodia. (**ANEJO-5**, *Transcripción de la toma de deposición del Sr. Pedreira Abreu*, **Pág. 52; L. 13-21**).

28. El Dr. Cintrón **no** se considera una persona activa en las redes sociales y no ha procurado promover contenido para que alguien reaccione a él en redes sociales. (**ANEJO-2**, *Transcripción de la toma de deposición del Dr. Cintrón*, **Pág. 96; L. 12-24**).

29. Al Dr. Cintrón no le interesa en este momento obtener reconocimiento en las redes sociales. (**ANEJO-2**, *Transcripción de la toma de deposición del Dr. Cintrón*, **Pág. 96; L. 12-24**).

30. El Dr. Cintrón además **no tiene criterio alguno para asignarle un valor particular a la utilización de su imagen**, porque le resulta especulativo. (**ANEJO-2**, *Transcripción de la toma de deposición del Dr. Cintrón*, **Pág. 70; L. 8-21 / Pág. 71; L. 1-9 / Pág. 71; L. 17 23**).

31. El Dr. Cintrón no puede testificar por qué es acreedor de cinco millones de dólares, como producto de la utilización de sus imágenes por MS, pero aduce que estará preparado en juicio para contestar esa pregunta, luego de consultar con sus abogados (**ANEJO-2**, *Transcripción de la toma de deposición del Dr. Cintrón*, **Pág. 25; L. 10-23 / Pág. 26; L. 1 14**).

32. El Dr. Cintrón no puede testificar por qué es acreedor de una compensación ascendente a diez millones de dólares, por la violación que imputa a MS del derecho de intimidad e imagen no comercial y a la dignidad, pero aduce que estará preparado en juicio para contestar esa pregunta, luego de consultar con sus abogados. (**ANEJO-2**, *Transcripción de la toma de deposición del Dr. Cintrón*, **Pág. 28; L. 10-18 / Pág. 29; L. 4-7**).

33. El Dr. Cintrón no puede testificar por qué es acreedor de una compensación ascendente a veinticuatro millones de dólares por los derechos protegidos por la ley del "derecho sobre la propia imagen", pero aduce que estará preparado en juicio para contestar esa pregunta, luego de consultar con sus abogados. (**ANEJO-2**, *Transcripción de la toma de deposición del Dr. Cintrón*, **Pág. 29; L. 8-17**).

34. El Dr. Cintrón percibió "la utilización ilegal de su imagen" durante el mes de diciembre de 2021 y presentó su demanda en autos el 23 de febrero de 2022, sin embargo, en ningún momento solicitó extrajudicialmente a MS que cesara y desistiera de utilizar su imagen, antes de presentar su acción. (**ANEJO-2**, *Transcripción de la toma de deposición del Dr. Cintrón*, **Pág. 107; L. 5-24**).[11]

En vista de lo anterior, **Medicina Sistémica** solicitó la desestimación de la demanda o en la alternativa, que el TPI concluyese que, ante la admisión realizada por la **Peticionaria**, a los efectos que se produjeron pautas televisivas con la imagen del doctor Cintrón Velázquez por un periodo no mayor de treinta (30) días, se le concediese a este último una compensación monetaria ascendente a $9,000.00.

En contraposición, el **1 de julio de 2025**, el **doctor Cintrón Velázquez** presentó su *Oposición a solicitud de Sentencia Sumaria*.[12] Allí enfatizó que:

> Contrario a la narrativa simplista y errónea de la parte demandada presentada en su solicitud de sentencia sumaria, los asuntos litigiosos en este caso son numerosos, complejos y, sobre todo, altamente controvertidos tanto en el plano fáctico como jurídico. El intento de la parte demandada de presentar este caso como uno donde "no existe controversia sustancial de hechos materiales" es insostenible a la luz del expediente y la prueba producida.[13]

A tono con lo antes expuesto, el **Recurrido** alegó que **los siguientes hechos materiales estaban en controversia**:

**1. Alcance y cumplimiento de las obligaciones contractuales sobre el uso y remoción de la imagen del Dr. Cintrón**

---

[11] Entrada Núm. 282 de SUMAC, páginas 4-9 de 14.

[12] Entrada Núm. 286 de SUMAC. Anejó los siguientes documentos: **ANEJO-1**, *Relevo y autorización: Sobre derechos de propia imagen*; **ANEJO-2**, *Porción de Contestación a Interrogatorio de parte del Dr. Cintrón*; **ANEJO-3**, *Informe Pericial del Sr. Pedreira Abreu*; **ANEJO-4**, *Mensaje de Texto de 7/febrero/2020 del Sr. Olalde*; **ANEJO-5**, *Mensaje de Texto de 9/febrero/2020 del Sr. Olalde*; **ANEJO-6**, *Mensaje de Texto de la Sra. María Vega*; **ANEJO-7**, *Transcripción de la toma de deposición de la Sra. Colón Quiñones*; **ANEJO-8**, *Transcripción de la toma de deposición del Dr. Cintrón*; **ANEJO-9**, *Transcripción de la toma de deposición del Sr. Pedreira Abreu*; **ANEJO-10**, *Transcripción de la toma de deposición del Sr. Olalde*; y, **ANEJO-11**, *Porción de Interrogatorio a Medicina Sistémica de parte del Dr. Cintrón*.

[13] Entrada Núm. 286 de SUMAC, página 5 de 35.

Existe una controversia genuina y fundamental respecto a la **interpretación y alcance de la cláusula novena del contrato de "Relevo y autorización: Sobre derechos de propia imagen"**. La parte demandante sostiene —y la evidencia lo respalda— que dicha cláusula exige no solo el cese inmediato del uso de la imagen tras la terminación contractual, sino también la remoción de toda presencia de la imagen del Dr. Cintrón de las redes sociales, plataformas digitales y cualquier medio promocional bajo control de la demandada. La interpretación restrictiva de la demandada, que pretende excluir la remoción digital, carece de todo apoyo contractual, comercial y jurisprudencial, y constituye una burla al sentido común y a la buena fe contractual.[14]

**2. Persistencia y uso no autorizado de la imagen tras la terminación contractual**

La evidencia documental, pericial y testimonial —incluyendo capturas de pantalla, videos, metadatos, informe pericial de Juan Carlos Pedreira y las deposiciones de la Sra. Marinelli Colón y el propio Dr. Cintrón— demuestra que la imagen del demandante **permaneció publicada y accesible al público en redes sociales y plataformas digitales de la demandada durante un periodo sustancial posterior a la terminación de la relación profesional**. Este uso persistente y no autorizado constituye una violación continua de la Ley 139-2011 y del propio contrato, generando daño real y cuantificable.[15]

**3. Autenticidad y admisibilidad de la evidencia digital**

Contrario a las alegaciones infundadas de la parte demandada, la autenticidad de la evidencia digital ha sido debidamente establecida mediante análisis forense, metadatos y secuencia numérica de archivos, conforme a la Regla 901 y la jurisprudencia federal y estatal. El informe pericial de Juan Carlos Pedreira, junto a los testimonios de los testigos con conocimiento directo, validan la integridad y autenticidad de las capturas de pantalla y videos presentados como prueba.[16]

**4. Daño económico, beneficio injusto y menoscabo a la imagen**

La cuantía de los daños, el beneficio económico obtenido por la demandada y el menoscabo sufrido por el Dr. Cintrón son asuntos de hecho que requieren adjudicación en juicio. La Ley 139-2011 faculta al tribunal a determinar estos extremos con base en la prueba disponible, sin requerir peritaje exclusivo sobre el valor económico de la imagen, máxime cuando la propia conducta de la demandada impidió la valoración precisa del impacto comercial.[17]

**5. Supuesta falta de requerimiento extrajudicial y mitigación de daños**

La demandada alega que el Dr. Cintrón no solicitó extrajudicialmente el cese y desista antes de demandar. Esta alegación es jurídicamente irrelevante: la Ley 139-2011 no exige requerimiento previo para accionar judicialmente. La obligación de

---

[14] Entrada Núm. 286 de SUMAC, páginas 5-6 de 35.
[15] Entrada Núm. 286 de SUMAC, página 6 de 35.
[16] *Íd.*
[17] *Íd.*

mitigar daños no puede ser utilizada como escudo para legitimar una violación continua y reiterada del derecho a la imagen.[18]

**6. Existencia de controversias materiales sobre hechos esenciales**

La evidencia en autos —contrato, demanda enmendada, contestaciones a interrogatorios, informes periciales y deposiciones— **genera controversias genuinas sobre todos los elementos esenciales de la causa de acción**: la existencia y alcance de la obligación de remover la imagen, la persistencia del uso no autorizado, la autenticidad de la evidencia digital, el beneficio económico obtenido, el daño sufrido y la cuantía de la reparación. Estos asuntos no pueden ser adjudicados sumariamente y requieren juicio en su fondo.[19]

Con respecto a los **hechos incontrovertidos** señalados por **Medicina Sistémica**, el **doctor Cintrón Velázquez** aceptó los hechos 1-5;[20] 11-19;[21] 21-23[22] y; 28-29.[23] Sin embargo, negó los hechos 6-10;[24] 20;[25] 24-27;[26] 30-34,[27] aduciendo la existencia de controversia de hechos. En consecuencia, solicitó que se declarara *No Ha Lugar* la moción de sentencia sumaria.

El **2 de julio de 2025**, el TPI emitió la *Resolución* recurrida.[28] Allí, acogió diecinueve (19) **determinaciones de hechos que no estaban en controversia**, según presentados por **Medicina Sistémica** y en los que el **doctor Cintrón Velázquez** no expresó oposición;[29] rezan como sigue:

1. El 15 de marzo de 2019 Medicina Sistémica LLC (en adelante denominada como "MS") y el Dr. Kenneth O. Cintrón Velázquez (en adelante denominado como el "Dr. Cintrón"), suscribieron un contrato intitulado Relevo y autorización: Sobre derechos de propia imagen.

2. En la cláusula TERCERA del Relevo y autorización: Sobre derechos de propia imagen, se estableció que, a beneficio del Dr. Cintrón, existiría una compensación única de $3,000.00 mensuales por los primeros 3 meses, a partir del momento en que su imagen comenzara a ser utilizada en los medios.

---

[18] Entrada Núm. 286 de SUMAC, páginas 6-7 de 35.
[19] Entrada Núm. 286 de SUMAC, página 7 de 35.
[20] Entrada Núm. 286 de SUMAC, páginas 7-9 de 35.
[21] Entrada Núm. 286 de SUMAC, páginas 13-15 de 35.
[22] Entrada Núm. 286 de SUMAC, páginas 13-18 de 35.
[23] Entrada Núm. 286 de SUMAC, páginas 24-25 de 35.
[24] Entrada Núm. 286 de SUMAC, páginas 9-13 de 35.
[25] Entrada Núm. 286 de SUMAC, página 16 de 35.
[26] Entrada Núm. 286 de SUMAC, páginas 18-24 de 35.
[27] Entrada Núm. 286 de SUMAC, páginas 25-27 de 35.
[28] Entrada Núm. 288 de SUMAC.
[29] Los **hechos incontrovertidos** 1-5, 11-19, 21-23 y 28-29 que **Medicina Sistémica** expuso en la petición de sentencia sumaria, fueron aceptados por el **doctor Cintrón Velázquez**.

3. En la cláusula CUARTA del Relevo y autorización: Sobre derechos de propia imagen las partes pactaron que el Dr. Cintrón concedía a MS autorización total y plena para que MS obtuviera material con imagen propia del Dr. Cintrón y le utilizara para el logro de los objetivos de mercadeo, publicidad y promoción de los servicios de Medicina Sistémica LLC.

4. En la cláusula SÉPTIMA del Relevo y autorización: Sobre derechos de propia imagen, el Dr. Cintrón reconoció que la campaña mediática no sólo beneficiará a MS, sino que sería también de beneficio para su propia imagen, al otorgarle notoriedad y prestigio en el ámbito profesional.

5. En la cláusula NOVENA del Relevo y autorización: Sobre derechos de propia imagen, las partes pactaron que ante la terminación del contrato de servicios profesionales existente entre MS y el Dr. Cintrón, MS descontinuaría de forma inmediata la utilización de material con imagen propia del Doctor.

6. La Sra. Marinelli Colón Quiñones es esposa del Dr. Cintrón.

7. Después de finales de 2021, la Sra. Colón accedía al portal de Facebook varias veces al día, a la semana y al mes.

8. El propósito para el cual la Sra. Colón accedía al portal de Facebook con esta regularidad era para ver la cuenta y derivar si imágenes del Dr. Cintrón permanecían en ella.

9. Cuando la Sra. Colón accedía al portal de Facebook, notaba que las imágenes eran las mismas a las que había accedido, probablemente, por la mañana, el día anterior, el mes anterior, y hasta seis meses antes.

10. En algunas instancias de búsqueda que realizaba la Sra. Colón, en el portal de Facebook, algunas imágenes no aparecían y otras sí aparecían.

11. De la búsqueda realizada por la Sra. Colón, esta derivó que, a lo largo del tiempo, fueron desapareciendo imágenes, porque hubo un movimiento de eliminación de videos.

12. Para acceder a algunas de las imágenes del Dr. Cintrón, la Sra. Colón tuvo que "desplazar" la pantalla (o hacer "scrolling"), para alimentar y refrescar esa página e ir encontrando las imágenes mientras navegaba la página.

13. La Sra. Colón se mantuvo accediendo a Facebook desde finales de diciembre de 2021, y si percibía imágenes de su esposo, el Dr. Cintrón, le tomaba capturas de pantalla ("screenshots") y así lo hizo por un año

14. La Sra. Colón solo accedió al portal de Facebook para indagar sobre la utilización de imágenes del Dr. Cintrón y no accedió a ninguna otra red social.

15. La Sra. Colón no recuerda cuántas capturas de pantalla tomó en total, durante ese período de más de un año, en que hizo visitas al portal de Facebook.

16. La Sra. Colón fue quien decidió qué imágenes el perito de la parte demandante (Sr. Pedreira Abreu) tomaría de su teléfono, para la realización de su análisis pericial.

17. El Dr. Cintrón, desde su aparato móvil, llegó a tomar capturas de pantalla, pero no recuerda cuántas tomó.

18. El Dr. Cintrón no se considera una persona activa en las redes sociales y no ha procurado promover contenido para que alguien reaccione a él en redes sociales.

19. Al Dr. Cintrón no le interesa en este momento obtener reconocimiento en las redes sociales.[30]

De este modo, —y aunque no hizo determinaciones de hechos en controversia— el tribunal de instancia concluyó que **existía controversia de hechos** a ser dirimidos y adjudicados mediante un juicio en su fondo. En lo pertinente, resolvió:

> No procede que se dicte sentencia sumaria toda vez que existe una controversia real sustancial sobre hechos esenciales y pertinentes que deben ser dirimidos y adjudicados en sus méritos en un juicio en su fondo. De igual modo, cabe señalar que el valor probatorio y la credibilidad de las declaraciones de los testigos de conocimiento o las opiniones de un testigo pericial sólo puede ser auscultada adecuadamente en un juicio en su fondo y no mediante una solicitud de sentencia sumaria.[31]

Por lo cual, declaró *No Ha Lugar* la solicitud de sentencia sumaria presentada por **Medicina Sistémica**.

En desacuerdo, el **22 de julio de 2025**, **Medicina Sistémica** sometió una *Moción en solicitud de reconsideración*.[32] En síntesis, adujo que la *Resolución* dictada por el TPI no formuló determinaciones sobre hechos de la moción de sentencia sumaria que no fueron controvertidos propiamente por el **doctor Cintrón Velázquez**. En consecuencia, solicitó que ante el incumplimiento con las exigencias de la Regla 36.4 de Procedimiento Civil, se reconsiderara la determinación tomada.

No obstante, el **23 de julio de 2025**, el tribunal de instancia emitió una *Orden* en la cual declaró *No Ha Lugar* la referida moción.[33]

Inconforme, el **21 de agosto de 2025**, **Medicina Sistémica** radicó el recurso de *certiorari* que nos ocupa y señaló la comisión de los siguientes errores:

---

[30] Entrada Núm. 288 de SUMAC, páginas 2-4 de 9.
[31] Entrada Núm. 288 de SUMAC, página 9 de 9.
[32] Entrada Núm. 289 de SUMAC.
[33] Entrada Núm. 290 de SUMAC.

1. *ERRÓ EL FORO DE INSTANCIA AL NO FORMULAR DETERMINACIONES SOBRE HECHOS DE LA MOCIÓN EN SOLICITUD DE SENTENCIA SUMARIA DE MEDICINA SISTÉMICA QUE NO FUERON CONTROVERTIDOS PROPIAMENTE.*

2. *ERRÓ EL FORO DE INSTANCIA AL DECLARAR NO HA LUGAR LA MOCIÓN EN SOLICITUD DE SENTENCIA SUMARIA DE MEDICINA SISTÉMICA LUEGO DE QUE LA OPOSICIÓN PRESENTARA FUNDAMENTOS Y/O CITAS FABRICADAS Y TERGIVERSADAS.*

3. *ERRÓ EL FORO DE INSTANCIA AL NO FORMULAR DETERMINACIONES DE HECHOS EN CONTROVERSIA DE CONFORMIDAD CON LA REGLA 36.4 DE PROCEDIMIENTO CIVIL*

El **25 de agosto de 2025**, emitimos una *Resolución* en la cual concedimos al **doctor Cintrón Velázquez** un plazo de diez (10) días para mostrar causa por la cual no debíamos expedir el auto de *certiorari* solicitado.[34] Así, el **6 de septiembre de 2025**, recibimos la *Oposición a solicitud de certiorari* de parte del **Recurrido**.

Así, el **11 de septiembre de 2025**, dimos por perfeccionado el recurso para la atención del Panel.[35]

**-II-**

**-A-**

El auto de *certiorari* es un medio procesal de carácter discrecional que, a su vez, permite a un tribunal de mayor jerarquía revisar las determinaciones de un tribunal inferior.[36] Así, se entiende por discreción como el poder para decidir en una forma u otra; esto es, para escoger entre uno o varios cursos de acción.[37]

Por ello, la Regla 52.1 de Procedimiento Civil, delimita las instancias en que habremos de atender —*vía certiorari*— las resoluciones y órdenes emitidas por los tribunales de instancia:

> [E]l recurso de certiorari para revisar resoluciones u órdenes interlocutorias dictadas por el Tribunal de Primera Instancia, solamente será expedido por el Tribunal de Apelaciones cuando se recurra de una resolución u orden bajo las Reglas 56 y 57 <u>o de la denegatoria de una moción de carácter dispositivo</u>. No

---

[34] Notificado el 27 de agosto de 2025.

[35] Notificado al día siguiente.

[36] *Mun. de Caguas v. JRO Construction,* 201 DPR 703, 711 (2019); *IG Builders et al. v. BBVAPR*, 185 DPR 307, 337 – 338 (2012).

[37] *García v. Asociación*, 165 DPR 311, 321 (2005).

obstante, y por excepción a lo dispuesto anteriormente, el Tribunal de Apelaciones podrá revisar órdenes o resoluciones interlocutorias dictadas por el Tribunal de Primera Instancia cuando se recurra de decisiones sobre la admisibilidad de testigos de hechos o peritos esenciales, asuntos relativos a privilegios evidenciarios, anotaciones de rebeldía, en casos de relaciones de familia, en casos que revistan interés público o en cualquier otra situación en la cual esperar a la apelación constituiría un fracaso irremediable de la justicia. Al denegar la expedición de un recurso de certiorari en estos casos, el Tribunal de Apelaciones no tiene que fundamentar su decisión. [...].[38]

Bajo el carácter de discrecionalidad, la Regla 40 del Reglamento de este Tribunal de Apelaciones establece los siguientes criterios para mostrar causa o para la expedición del auto de *certiorari:*

(A) Si el remedio y la disposición de la decisión recurrida, a diferencia de sus fundamentos, son contrarios a derecho.
(B) Si la situación de hechos planteada es la más indicada para el análisis del problema.
(C) Si ha mediado prejuicio, parcialidad o error craso y manifiesto en la apreciación de la prueba por el Tribunal de Primera Instancia.
(D) Si el asunto planteado exige consideración más detenida a la luz de los autos originales, los cuales deberán ser elevados, o de alegatos más elaborados.
(E) Si la etapa del procedimiento en que se presenta el caso es la más propicia para su consideración.
(F) Si la expedición del auto o de la orden de mostrar causa no causan un fraccionamiento indebido del pleito y una dilación indeseable en la solución final del litigio.
(G) Si la expedición del auto o de la orden de mostrar causa evita un fracaso de la justicia.[39]

En consecuencia, el Tribunal Supremo de Puerto Rico ha dispuesto que:

[d]e ordinario, no se intervendrá con el ejercicio de discreción de los tribunales de instancia, salvo que se demuestre que hubo un craso abuso de discreción, o que el tribunal actuó con prejuicio o parcialidad, o que se equivocó en la interpretación o aplicación de cualquier norma procesal o de derecho sustantivo, y que nuestra intervención en esa etapa evitará un perjuicio sustancial.[40]

De manera, que si la actuación del foro recurrido no está desprovista de base razonable —ni perjudica los derechos sustanciales

---

[38] Regla 52.1 de las Reglas de Procedimiento Civil 2009, 32 LPRA Ap. V., R. 52.1. *Énfasis nuestro.*
[39] Regla 40 del Reglamento del Tribunal de Apelaciones, según enmendada, *In re Aprob. Enmdas. Reglamento TA*, 2025 TSPR 141, pág. 63, 216 DPR __ (2025).
[40] *Zorniak Air Services v. Cessna Aircraft Co.*, 132 DPR 170, 181 (1992); *Lluch v. España Service Sta.*, 117 DPR 729, 745 (1986).

de las partes— deberá prevalecer el criterio del juez de instancia a quien le corresponde la dirección del proceso.[41]

**-B-**

El mecanismo de sentencia sumaria procura, ante todo, aligerar la tramitación de aquellos casos en los cuales no existe una controversia de hechos real y sustancial que exija la celebración de un juicio en su fondo.[42] Al respecto, es la Regla 36 de Procedimiento Civil la que regula el proceso mediante el cual cualquiera de las partes en un pleito puede solicitar al tribunal que dicte sentencia sumaria a su favor.[43] Así, cuando cualquier parte reclamante solicite que el pleito sea resuelto por la vía sumaria, deberá demostrar en su solicitud, *"la inexistencia de una controversia sustancial de hechos esenciales y pertinentes, para que el tribunal dicte sentencia sumariamente a su favor sobre la totalidad o cualquier parte de la reclamación".[44]*

De modo que el criterio rector al momento de considerar la procedencia de un dictamen sumario es que no haya controversia sobre los hechos esenciales y pertinentes, según alegados por las partes en sus respectivas solicitudes y/u oposiciones, y que sólo reste aplicar el derecho.[45] Los jueces no están limitados por los hechos o documentos evidenciarlos que se aduzcan en la solicitud de sentencia sumaria. Deben considerar todos los documentos en autos, sean o no parte de la solicitud, de los cuales surjan *admisiones* hechas por las partes.[46] La fórmula, debe ser, por lo tanto, que la moción de sentencia sumaria adecuadamente presentada solo puede negarse si la parte que se opone a

---

[41] *SLG Zapata- Rivera v. JF Montalvo*, 189 DPR 414, 434 – 435 (2013).
[42] *Rodríguez García v. UCA*, 200 DPR 929 (2018).
[43] Reglas de Procedimiento Civil de 2009, 32 LPRA Ap. V., R. 36.
[44] 32 LPRA Ap. V. R. 36.1 y 36.2.
[45] *Velázquez Ortiz v. Mun. de Humacao*, 197 DPR 656, 661 (2017).
[46] *Vera v. Dr. Bravo*, 161 DPR 308, 333 (2004).

ella presenta una oposición basada en hechos que puedan mover a un juez a resolver a su favor.[47]

Si el juez se convence de que no existe una posibilidad razonable de que escuchar lo que lee no podrá conducirlo a una decisión a favor de esa parte, debe dictar sentencia sumaria.[48] Quiere decir que, en ausencia de una controversia de hechos materiales discernible, corresponderá a los tribunales aplicar el derecho y resolver conforme al mismo.[49]

En cambio, el TPI no deberá dictar sentencia sumaria cuando: **(1)** existen hechos materiales controvertidos; **(2)** hay alegaciones afirmativas en la demanda que no han sido refutadas; **(3)** surge de los propios documentos que se acompañan con la moción una controversia real sobre algún hecho material; y **(4)** como cuestión de derecho no procede.[50]

Por otra parte, es menester señalar que al ejercer nuestra función revisora sobre decisiones en las que se aprueba o deniega una solicitud de sentencia sumaria, nos encontramos en la misma posición que los foros de primera instancia.[51]

Siendo la revisión una de *novo*, debemos ceñirnos a los mismos criterios y reglas que nuestro ordenamiento les impone a estos, y debemos constatar que los escritos de las partes cumplan con los requisitos codificados en la Regla 36 de Procedimiento Civil, *supra*.[52] A tenor con lo expuesto, el Tribunal Supremo de Puerto Rico, ha pautado lo siguiente:

> [E]l Tribunal de Apelaciones debe revisar si en realidad existen hechos materiales en controversia. De haberlos, el foro apelativo intermedio tiene que cumplir con la exigencia de la Regla 36.4 de Procedimiento Civil y debe exponer concretamente cuáles hechos materiales encontró que están en controversia y cuáles están incontrovertidos. [...].
> [Por el contrario], de encontrar que los hechos materiales realmente están incontrovertidos, el foro apelativo intermedio

---

[47] *Velázquez Ortiz v. Mun. de Humacao, supra.*
[48] *Id.*
[49] *Rodríguez García v. UCA, supra.*
[50] *Fernández Martínez v. RAD-MAN San Juan III-D, LLC*, 208 DPR 310, 335 (2021).
[51] *Rivera Matos et al. v. Triple-S et al.,* 204 DPR 1010, 1025 (2020); *González Santiago v. Baxter Healthcare,* 202 DPR 281, 291 (2019).
[52] *Meléndez González et al. v. M. Cuebas*, 193 DPR 100, 118 (2015).

procederá entonces a revisar de novo si el Tribunal de Primera Instancia aplicó correctamente el Derecho a la controversia.[53]

Desde luego, el alcance de nuestra función apelativa al intervenir en estos casos no comprenderá la consideración de prueba que no fue presentada ante el foro de primera instancia, ni la adjudicación de hechos materiales en controversia.[54]

**-III-**

En esencia, **Medicina Sistémica** arguye ante nos que el tribunal de instancia incidió: **(1)** al no formular determinaciones sobre hechos de la moción de sentencia sumaria que no fueron controvertidos; **(2)** al denegar la moción de sentencia sumaria que fuera presentada por sí, luego de que la oposición presentara fundamentos y/o citas fabricadas y tergiversadas; **(3)** al no formular determinaciones de hechos en controversia de conformidad con la Regla 36.4 de Procedimiento Civil.

Dado que los referidos errores se encuentran íntimamente relacionados, procederemos a discutirlos en conjunto. Veamos.

**Primeramente**, por estar en igual posición que el TPI, nos compete —como foro intermedio— determinar *de novo* si las partes cumplieron con los requisitos que impone la referida Regla 36 de Procedimiento Civil. Un análisis objetivo de ambas solicitudes nos lleva a concluir que **Medicina Sistémica** cumplió con todos los trámites procesales correspondientes de la sentencia sumaria. Es decir, enumeró los hechos esenciales y pertinentes, y sostuvo sus alegaciones al unir junto a ellas documentos admisibles en evidencia. De igual modo, el **doctor Cintrón Velázquez** cumplió con lo preceptuado por la Regla 36 de Procedimiento, al oponerse correctamente en derecho a los incisos 7-10; 20; 24-27; 30-34; no obstante, notamos que incumplió en fundamentar con citas

---

[53] *Id.*, págs. 118-119.
[54] *Id.*

legales y correctas su oposición a la determinación de hechos núm. 6 de la moción de sentencia sumaria.[55]

No obstante, procedemos *de novo* a reformular y renumerar las siguientes determinaciones de **hechos materiales que no están en controversia**, para que lean como siguen:

1. El 15 de marzo de 2019 Medicina Sistémica LLC (en adelante denominada como "MS") y el Dr. Kenneth O. Cintrón Velázquez (en adelante denominado como el "Dr. Cintrón"), suscribieron un contrato intitulado Relevo y autorización: Sobre derechos de propia imagen.

2. En la cláusula TERCERA del Relevo y autorización: Sobre derechos de propia imagen, se estableció que, a beneficio del Dr. Cintrón, existiría una compensación única de $3,000.00 mensuales por los primeros 3 meses, a partir del momento en que su imagen comenzara a ser utilizada en los medios.

3. En la cláusula CUARTA del Relevo y autorización: Sobre derechos de propia imagen las partes pactaron que el Dr. Cintrón concedía a MS autorización total y plena para que MS obtuviera material con imagen propia del Dr. Cintrón y le utilizara para el logro de los objetivos de mercadeo, publicidad y promoción de los servicios de Medicina Sistémica LLC.

4. En la cláusula SÉPTIMA del Relevo y autorización: Sobre derechos de propia imagen, el Dr. Cintrón reconoció que la campaña mediática no solo beneficiará a MS, sino que sería también de beneficio para su propia imagen, al otorgarle notoriedad y prestigio en el ámbito profesional.

5. En la cláusula NOVENA del Relevo y autorización: Sobre derechos de propia imagen, las partes pactaron que ante la terminación del contrato de servicios profesionales existente entre MS y el Dr. Cintrón, MS descontinuaría de forma **inmediata** la utilización de material con imagen propia del Doctor.[56]

---

[55] Tras una corroboración de las citas legales utilizadas por la representación legal del **doctor Cintrón Velázquez** en apoyo a su oposición a la determinación de hechos núm. (6) de la moción de sentencia sumaria radicada por **Medicina Sistémica**, nos percatamos que las mismas adolecen de validez jurídica e inducen a error este Tribunal. Si bien reconocemos la utilidad de la tecnología como una herramienta que facilita nuestras funciones, esta debe ser utilizada con mesura y honesta. Le recordamos a los abogados del **Recurrido** que las *Reglas de Conducta Profesional de Puerto Rico* establecen, entre otros, que: "Las personas que ejercen la profesión legal deberán adquirir las destrezas necesarias y mantener un conocimiento razonable sobre los desarrollos tecnológicos que puedan impactar la práctica del Derecho y la función notarial. Esto incluye el deber de utilizar la tecnología de manera diligente y con conocimiento de sus beneficios y riesgos, a fin de prestar una representación legal o ejercer la función notarial de manera competente y efectiva." *Véase,* Regla 1.19 sobre *Competencia y diligencia tecnológica* de las *Reglas de Conducta Profesional de Puerto Rico.*
[56] Las determinaciones de hechos no controvertidas del **1 al 5** de esta Sentencia fueron presentadas por **Medicina Sistémica** en su moción de sentencia sumaria y aceptadas por el **doctor Cintrón Velázquez** en su oposición.

6. Durante la vigencia del contrato de *Relevo y autorización: Sobre derechos de propia imagen*, se publicaron comerciales televisivos y se colgaron en redes sociales: *YouTube* o *Facebook*, las imágenes del Dr. Cintrón.[57]

7. Al finalizar la relación contractual entre las partes, MS le solicitó al Dr. Cintrón que le permitiera el uso de las imágenes hasta el 15 de marzo del 2020, pero este se negó, y solo permitió que las imágenes fueran utilizadas hasta el 1 de febrero de 2020.[58]

8. La Sra. Marinelli Colón Quiñones es esposa del Dr. Cintrón. (en adelante denominada como "Sra. Colón").[59]

9. Después de finales de 2021, la Sra. Colón accedía al portal de Facebook varias veces al día, a la semana y al mes.

10. El propósito para el cual la Sra. Colón accedía al portal de Facebook con esta regularidad era para ver la cuenta y derivar si imágenes del Dr. Cintrón permanecían en ella.

11. Cuando la Sra. Colón accedía al portal de Facebook, notaba que las imágenes eran las mismas a las que había accedido, probablemente, por la mañana, el día anterior, el mes anterior, y hasta seis meses antes.

12. En algunas instancias de búsqueda que realizaba la Sra. Colón, en el portal de Facebook, algunas imágenes no aparecían y otras sí aparecían.

13. De la búsqueda realizada por la Sra. Colón, esta derivó que, a lo largo del tiempo, fueron desapareciendo imágenes, porque hubo un movimiento de eliminación de videos.

14. Para acceder a algunas de las imágenes del Dr. Cintrón, la Sra. Colón tuvo que "desplazar" la pantalla (o hacer "scrolling"), para alimentar y refrescar esa página e ir encontrando las imágenes mientras navegaba la página

15. La Sra. Colón se mantuvo accediendo a Facebook desde finales de diciembre de 2021, y si percibía imágenes de su esposo, el Dr. Cintrón, le tomaba capturas de pantalla ("screenshots") y así lo hizo por un año.

16. La Sra. Colón solo accedió al portal de Facebook para indagar sobre la utilización de imágenes del Dr. Cintrón y no accedió a ninguna otra red social.

---

[57] La determinación de hecho **no controvertida núm. 6 de esta Sentencia**, responde a una reformulación concreta de la determinación de hecho incontrovertida **núm. 7**, presentada por **Medicina Sistémica** en su moción sumaria, que permite limitar el alcance de lo publicado hasta la vigencia del contrato.

[58] En esta Sentencia la determinación de **hecho no controvertido núm. 7**, corresponde al hecho incontrovertido **núm. 8** presentado por **Medicina Sistémica** en su petición sumaria, pero elimina la última oración ya que existe controversia de hechos sobre si el Sr. Olalde eliminó **efectivamente** todas las publicaciones al 31 de enero de 2020. Por esa misma razón, existe controversia de hechos en la determinación **núm. 9** presentada por **Medicina Sistémica** en su moción.

[59] Advertimos que las **determinaciones de hechos incontrovertidas del núm. 8 al 19 de esta Sentencia**, corresponden a las determinaciones de **hechos no controvertidos del núm. 11 al 23** que hiciera **Medicina Sistémica** en su petición de sentencia sumaria y que fueron aceptados por el **doctor Cintrón Velázquez** en su escrito de oposición.

17. La Sra. Colón no recuerda cuántas capturas de pantalla tomó en total, durante ese período de más de un año, en que hizo visitas al portal de Facebook.

18. La Sra. Colón fue quien decidió qué imágenes el perito de la parte demandante (Sr. Pedreira Abreu) tomaría de su teléfono, para la realización de su análisis pericial.

19. El Dr. Cintrón, desde su aparato móvil, llegó a tomar capturas de pantalla, pero no recuerda cuántas tomó.

20. El Dr. Cintrón **no** se considera una persona activa en las redes sociales y no ha procurado promover contenido para que alguien reaccione a él en redes sociales.[60]

21. Al Dr. Cintrón no le interesa en este momento obtener reconocimiento en las redes sociales.[61]

En **segundo lugar**, —y ante la ausencia de hechos en controversia de la *Resolución* recurrida— nos corresponde esbozar cuáles son las controversias materiales de hechos habida entre las partes.

Tras una sosegada evaluación del expediente ante nuestra consideración, formulamos las siguientes determinaciones de hechos materiales en controversia a resolverse por el TPI:

1. Si MS **descontinuó todo uso** de "material con imagen propia del Doctor" de forma inmediata, en virtud de la cláusula novena del contrato.[62]
2. Si al finalizar el contrato entre las partes, el Sr. Olalde **descontinuó todo uso** de material con imagen propia del Dr. Cintrón de forma inmediata al 31 de enero de 2020.[63]
3. Posterior a la terminación del contrato, MS admite como un error que en febrero del año 2022 utilizó la imagen del Dr. Cintrón, en un período de treinta (30) días. Alega que esos treinta (30) días fueron del 25 de enero del año 2022, hasta el 22 de febrero del año 2022.[64]

---

[60] Cabe destacar que las **determinaciones de hechos incontrovertidas del núm. 20 al 21 de esta Sentencia**, corresponden a las determinaciones de **hechos no controvertidos del núm. 28 al 29** que hiciera **Medicina Sistémica** en su petición de sentencia sumaria y que fueron aceptados por el **doctor Cintrón Velázquez** en su escrito de oposición.

[61] Resulta preciso aclarar que la determinación de **hecho incontrovertida núm. 20** presentada por **Medicina Sistémica** en su moción de sentencia sumaria, no constituye un hecho material.

[62] En esta Sentencia la determinación de **hecho en controversia núm. 1**, corresponde a una reformulación del hecho incontrovertido **núm. 6** presentado por **Medicina Sistémica** en su moción sumaria, ya que existe controversia de hechos sobre si MS descontinuó todo uso de la imagen del **doctor Cintrón Velázquez** en las redes sociales. Por esa misma razón, existe controversia de hechos en la determinación **núm. 9** presentada por **Medicina Sistémica** en su moción.

[63] En esta Sentencia la determinación de **hecho en controversia núm. 2**, corresponde a la última oración del hecho incontrovertido **núm. 8** presentado por **Medicina Sistémica** en su petición sumaria, ya que existe controversia de hechos sobre si el Sr. Olalde eliminó **efectivamente** todas las publicaciones al 31 de enero de 2020. Por esa misma razón, existe controversia de hechos en la determinación **núm. 9** presentada por **Medicina Sistémica** en su moción.

[64] La determinación de **hecho en controversia núm. 3** de esta Sentencia, responde a la determinación de hecho incontrovertida **núm. 10**, presentada por **Medicina Sistémica**

4. En cuántas ocasiones, además de la admitida por MS, la imagen propia del Dr. Cintrón fue utilizada por MS posterior a la terminación del contrato.[65]
5. Si el doctor Cintrón Velázquez sufrió un daño como consecuencia de la utilización de su imagen por el cual deba ser indemnizado.[66]
6. A cuánto ascienden los daños sufridos por el Dr. Cintrón por MS **no descontinuar todo uso** de "material con imagen propia del Doctor" de forma inmediata.[67]

Esbozados los hechos en controversias, procedemos expedir el auto de *certiorari* y a **modificar** la <u>Resolución</u> recurrida en cuanto a los veintiún (21) hechos incontrovertidos y los seis (6) hechos en controversia adoptados en esta Sentencia; así, confirmamos el resto de la determinación del TPI. Por lo cual, ordenamos la continuación del caso para que se celebre juicio sobre las causas pendientes.

**-IV-**

Por los fundamentos antes expuestos, expedimos el recurso de *certiorari* y modificamos la <u>Resolución</u> recurrida para adoptar hechos que no están en controversia y enmarcar los hechos que sí están en controversia; así modificada, se confirma.

Lo pronunció y manda el Tribunal y lo certifica su Secretaria.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones

---

en su solicitud sumaria, ya que sujeta el alegado error a prueba en contrario por parte del **doctor Cintrón Velázquez**.

[65] La determinación de **hecho en controversia núm. 4** de esta Sentencia, responde a las determinaciones de hechos incontrovertidas **núm. 24** al **núm. 27**, presentada por **Medicina Sistémica** en su solicitud sumaria, ya que esa prueba está sujeta a la evidencia pericial y testimonial que presente el **doctor Cintrón Velázquez**.

[66] La determinación de **hecho en controversia núm. 5** de esta Sentencia, responde a las determinaciones de hechos incontrovertidas **núm. 30** al **núm. 34**, presentada por **Medicina Sistémica** en su solicitud sumaria, ya que esa prueba está sujeta a la evidencia pericial y testimonial que presente el **doctor Cintrón Velázquez**.

[67] Esta determinación de **hecho en controversia núm. 6**, está sujeta a la evidencia pericial y testimonial que presente el **doctor Cintrón Velázquez**.